## CONTINUATION OF AN APPLICATION UNDER
## RULE 41 FOR A WARRANT TO SEARCH DEVICES IN CUSTODY

I, Jeffrey T. Williams, being duly sworn, depose and state as follows:

### INTRODUCTION

1. I make this continuation of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—cellular telephones, as described in Attachment A—that are currently in the possession of law enforcement, and the extraction of electronically stored information from that property as described in Attachment B.

2. I am a Special Agent (SA) with Homeland Security Investigations (HSI), Department of Homeland Security (DHS), assigned to the Special Agent in Charge (SAC) Office in Detroit, Michigan, and have been so employed since March 9, 2012. I am currently assigned to the Assistant Special Agent in Charge (ASAC) Office in Grand Rapids, Michigan. I have a Bachelor of Arts degree in Political Science from Youngstown State University. I have successfully completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I have also received training in the manner and means by which individuals engage in narcotics trafficking. Prior to my employment with HSI, I was a Senior Special Agent with the Diplomatic Security Service (DSS) serving in Iraq, Pakistan, and Afghanistan. Prior to my employment with DSS, I was an ATSAC with the Federal Air Marshal Service (FAMS) in charge of the Investigations Division,

1

Counter Terrorism Branch at Headquarters. Prior to my employment with the FAMS, I was an Agent with the United States Border Patrol serving as a Team Leader with the Special Operations Group(s) in San Diego, California. I possess over twenty years of federal law enforcement experience. As part of my duties, I investigate criminal violations relating to narcotics trafficking, including violations pertaining to the illegal production, distribution, receipt and possession of dangerous drugs, and associated conspiracy in violation of Title 21, United States Code, Sections 841, and 846. I have received training and instruction in the field of investigation of narcotics trafficking and have had the opportunity to participate in investigations relating to the trafficking of dangerous drugs.

3. Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically 21 U.S.C. §§ 841 and 846, conspiracy to distribute and to possess with intent to distribute controlled substances, will be found on certain electronic devices, namely **Subject Devices 1 through 11** (collectively the "**Subject Devices**," described more fully in Attachment A). The categories of electronically stored information and evidence sought are described in Attachment B.

4. This Application requests the issuance of a warrant to examine the **Subject Devices**, which were seized on December 11, 2019, during the execution of fifteen federal search warrants and associated arrest warrants in the Western District of Michigan.

5. This Continuation arises from the Title III investigation described

in the Continuation in Support of the Criminal Complaint by Special Agent Jerry Deaven filed on December 10, 2019, No. 1-19-MJ-420 (the Complaint Continuation), charging Andrew Rolando Bravo and nine others with conspiracy to distribute and possess with controlled substances in violation of 21 U.S.C. §§ 841, 846.  I incorporate the Complaint Continuation by reference herein.  This Continuation also arises from the Continuation in Support of the Criminal Complaint of Troy Edward Bush and Donald Bernard Mosley by Special Agent Scott Bauer filed on December 12, 2019, Nos. 1-19-MJ-442 and 1-19-MJ-443 (the Bush-Mosley Complaint Continuation) charging the defendants with various drug trafficking violations.  I also incorporate the Bush-Mosley Complaint Continuation by reference herein.

6.  I know from training and experience that drug traffickers frequently utilize mobile telephones and other electronic devices, such as tablets and laptop and desktop computers, to facilitate drug trafficking.  Mobile telephones are portable, and some mobile telecommunications service providers do not require purchasers of the devices to provide their names and/or addresses, so drug traffickers often use the devices in an effort to avoid detection by law enforcement. Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls and text messages with suppliers of drugs; voicemail messages; photographs of drugs, co-conspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time, providing evidence that the device was in high drug trafficking areas or evidencing the route used in

trafficking controlled substances. Additionally, drug traffickers typically maintain and use multiple mobile phones to facilitate sales, and frequently switch phones to evade detection by law enforcement. Further, these types of devices are frequently used to access social media websites such as Facebook, Instagram, etc. In my training and experience, drug traffickers are using social media with increasing frequency to communicate with suppliers and purchasers of controlled substances. I also know from training and experience that drug traffickers utilize cell phone cameras and video cameras to take photos/video of controlled substances, currency, high value items, and co-conspirators.

7. To the extent that I incorporated quoted language from intercepted communications described in other affidavits into this continuation, these quotes are taken from careful review of the communications by me or other law enforcement officials who have reviewed the communications. These quotes are still in draft format and are not intended to be final transcripts or quotations. My interpretations are based on the contents and contexts of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, information provided by confidential sources, my experience and training, and the experience and training of other law enforcement agents in this investigation.

8. The information set forth in this continuation is based upon my personal knowledge and participation in the investigation described below, as well as information provided to me by other law enforcement officers. I have not set forth all of the information known to me or known to other law

enforcement officers concerning this matter. This continuation is intended to show only that there is sufficient probable cause for the requested warrant.

## PROBABLE CAUSE

9. On December 10 and December 12, 2019, United States Magistrate Judge Ray Kent for the United States District Court for the Western of Michigan signed criminal complaints setting forth probable cause that defendants Andrew Rolando Bravo, Wayne Henry Hawley, Christopher Michael Dreams, Erineo Wallace, Sharell Lana-Mika Hall, James Walter Shelton, Jr., Jeremiah E. Smith, Rodney Compton, Mark Anthony Mosley, Cory Karl Cadieux, Troy Edward Bush, and Donald Bernard Mosley committed violations of federal controlled substances laws and issued arrest warrants. In addition to issuing arrest warrants, the Court issued search warrants for nine premises in the original complaint (Subject Premises 1 – 9) and six additional premises (Subject Premises 10 – 15). Attachment A to the premises search warrants permitted law enforcement to seize "telephone devices (telephones, cellular / mobile / digital / smart telephones, digital pagers, voice pagers, alpha-numeric display pagers)." *See* Nos. 1:19-mj-420, 1:19-mj-442, 1:19-mj-443.

10. During the execution of the court-authorized search warrants, law enforcement officers seized, among other evidence, cellular devices that belonged to individuals charged in the criminal complaints described above in paragraph 9. Those devices are in law enforcement custody and the subject of this search warrant, as described below for each individual.

I. **Andrew Rolando Bravo Devices (Subject Devices 1 - 4)**

11. On December 11, 2019, law enforcement executed a search warrant of Subject Premises 2, Bravo's residence. In Subject Premises 2, law enforcement seized 33 cellular devices including the following:

   a. a black iPhone 8+ with the phone number (313) 854-4068, which is described in the Complaint Continuation and Title III affidavits as Target Phone 1 (**Subject Device 1**). Bravo's use of **Subject Device 1** for purposes of drug trafficking is documented in the Complaint Continuation, including on pages 18, 20, 23-24, and 27-34;

   b. a black iPhone 6s with the phone number (313) 675-5302, which is described in the Complaint Continuation and Title III affidavits as Target Phone 2 (**Subject Device 2**). Bravo's use of **Subject Device 2** for purposes of drug trafficking is documented in the Complaint Continuation, including on pages 42-78;

   c. a peach colored iPhone 6s with the phone number (616) 655-4947, which is described in the Complaint Continuation as Target Phone 3 (**Subject Device 3**). Bravo's use of **Subject Device 3** for purposes of drug trafficking is documented in the Complaint Continuation, including on pages 80-97; 102, 104, and 107;

   d. a black LG phone, with the phone number (419) 503-7386 (**Subject Device 4**). Phone tolls obtained for **Subject Device 4** showed that Bravo used the device to contact other subjects of the investigation, and was increasing usage of the device consistent with past practices

of transitioning usage of phones for purposes of drug trafficking and evading law enforcement detection.

## II. Wayne Henry Hawley Device

12. On December 11, 2019, law enforcement executed an arrest warrant of Hawley and a search warrant of Subject Premises 10, a hotel room at the Quality Inn hotel in Battle Creek, Michigan where Hawley was staying. In executing the warrants, law enforcement seized a black Motorola phone with the phone number (269) 579-1670 (**Subject Device 5**). Hawley's use of **Subject Device 5** for purposes of drug trafficking is documented in the Complaint Continuation, including on pages 115 and 119.

## III. Christopher Michael Dreams Device

13. On December 11, 2019, law enforcement executed an arrest warrant of Dreams and a search warrant of Subject Premises 5, Dreams' residence. In executing the warrants, law enforcement seized a black LG phone with the phone number (916) 805-3625 (**Subject Device 6**). Dreams' use of **Subject Device 6** for purposes of drug trafficking is documented in the Complaint Continuation, including on pages 48-55, 100, 104, and 116.

## IV. Mark Anthony Mosley Device

14. On December 11, 2019, law enforcement executed an arrest warrant of Mark Anthony Mosley and a search warrant of Subject Premises 8, Mosley's residence. In executing the warrants, law enforcement seized a white iPhone X with the phone number (269) 967-3607 (**Subject Device 7**). Mosley's use of **Subject Device 7** for purposes of drug trafficking is documented in the Complaint

Continuation, including on pages 35, 59-63, 86-91, 121-127, and 130.

### V. Jeremiah E. Smith Device

15. On December 11, 2019, law enforcement executed an arrest warrant of Smith and a search warrant of Subject Premises 7, Smith's residence. In executing the warrants, law enforcement seized a silver iPhone 11 with the phone number (269) 214-7480 (**Subject Device 8**). Smith's use of **Subject Device 8** for purposes of drug trafficking is documented in the Complaint Continuation, including on pages 57-59, 80-86, 111, and 120-121.

### VI. James Walter Shelton, Jr. Device

16. On December 11, 2019, law enforcement executed an arrest warrant of Shelton. In executing the arrest warrant, law enforcement seized on Shelton's person a black LG LM x420 mobile phone with the phone number (269) 358-6942 (**Subject Device 9**). Shelton's use of **Subject Device 9** for purposes of drug trafficking is documented in the Complaint Continuation, including on pages 64-70, 78, 106-109, 128, and 130.

### VII. Troy Edward Bush Device

17. On December 11, 2019, law enforcement executed a search warrant of Subject Premises 4, Bush's residence. After law enforcement recovered 50 grams or more of methamphetamine from the house and bulk quantities of marijuana, law enforcement arrested Bush on state charges. Law enforcement found in executing the search a rose gold colored iPhone with the phone number (269) 267-1514 (**Subject Device 10**). Bush told law enforcement that the **Subject Device 10** was

8

his phone. Bush's use of **Subject Device 10** for purposes of drug trafficking is documented in the Complaint Continuation, including on pages 98-100, and on page 3 of the Bush-Mosley Complaint Continuation.

### VIII. Donald Mosley Device

18. On December 11, 2019, at approximately 6 AM, law enforcement executed the search of Subject Premises 9 and found Donald Mosley and a female subject alone in a bedroom of that residence. Donald Mosley is the brother of codefendant Mark Anthony Mosley.

19. Mark Mosley, Bravo, and others' use of Subject Premises 9 as part the conspiracy, is described, among other places, on pages 121-126 of the Complaint Continuation.

20. During the execution of the search of Subject Premises 9, Donald Mosley and a female subject were present in a bedroom. There were no other individuals at the residence at the time of execution. In the bedroom that Donald Mosley and the female subject were found in, law enforcement found approximately 2.74 grams of a white substance that field tested positive for cocaine. Law enforcement also found a black Cricket Wireless cell phone that Donald Mosley admitted was his phone (**Subject Device 11**).

21. Elsewhere in Subject Premises 9, law enforcement found approximately 27.10 gross grams of a crystalline substance that field tested positive as methamphetamine, a black digital scale, and packaging material.

22. The female subject was interviewed and stated that Mosley provided her with drugs for personal use.

9

23. Based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

    a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

    b. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices;

    c. Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices;

    d. That drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business;

    e. Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

    f. User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

    g. Drug traffickers often use the internet to look up various information to support their drug trafficking activities;

10

   h. That drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns. Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from. Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their devices;

   i. That it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers. These and other items are maintained by the drug traffickers within their residences, businesses, or other locations over which they maintain dominion and control.

   j. That when drug traffickers amass large proceeds from the sale

11

of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

  k. That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money").

  l. That it is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

  m. That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions.

  n. That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. The "source" of their income reported on tax returns can be falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

o. That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

p. That drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service.

## **TECHNICAL TERMS**

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the internet. Wireless telephones may also include GPS technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records

13

pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.    Portable media player: A portable media player (or "MP3 Player" or "iPod") is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

      d.    GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records and locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.

14

Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDA's usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

        f.      Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or

otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

      g.    Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

      h.    IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      i.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      25.    Based on my training, experience, and research, I know that the

**Subject Devices** have capabilities that allow them to serve as a wireless telephone, GPS, and data storage device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. The warrant applied for would authorize the extraction and copying of electronically stored information, all under Rule 41(e)(2)(B).

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic electronic evidence that establishes how the **Subject Devices** were used, the purpose of the use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or

17

controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose any parts of the device to human

inspection in order to determine whether it is evidence described by the warrant.

30. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSON**

31. I respectfully submit that there is probable cause to believe that the defendants (i) conspired with each other, and with others known and unknown, to knowingly and intentionally distribute and possess with intent to distribute, and (ii) possessed with intent to distribute, cocaine, cocaine base, methamphetamine, heroin, 3,4 methylenedioxymethamphetamine (MDMA), and marihuana, in violation of 21 U.S.C. §§ 841 and 846, and further that there is probable cause to search the **Subject Devices** described in Attachment A and to seize the items described in Attachment B.